**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JERRY K. HITCHCOCK,          )
                       )
       Plaintiff,         )
                       )
       v.              )       Civil Action No. 09-551
                       )
COMMISSIONER OF SOCIAL     )       Judge Nora Barry Fischer
SECURITY ADMINISTRATION,    )
                       )
       Defendant.     )

**MEMORANDUM OPINION**

This action was filed by Jerry Hitchcock ("Plaintiff") pursuant to 42 U.S.C. §405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.  Presently before the Court are Cross-Motions for Summary Judgment. (Docket Nos. 8 and 10).  The parties have filed briefs in support of their respective motions (Docket Nos. 9 and 11).  Upon analysis and consideration of each submission, and as set forth herein, Plaintiff's motion will be granted in part and denied in part, the Commissioner's motion will be denied and the decision of the Administrative Law Judge will be vacated and remanded.

I.    **PROCEDURAL HISTORY**

Plaintiff filed an application for DIB on June 13, 2006, alleging disability due to his loss of hearing and sight, hip, shoulder and neck pain, leg burns and shortness of breath, all beginning on October 1, 2000. (Docket No. 6 at 117-121, 128, hereinafter "R. at __").  Plaintiff's claims were initially denied on October 5, 2006, and a hearing was held before an Administrative Law Judge ("ALJ") on September 10, 2008. (R. at 10-56, 70-73).  Plaintiff appeared and testified at

the hearing and was represented by counsel. (R. at 10-56).  Additionally, a Vocational Expert ("VE") was present and gave testimony. *(Id.)*   On October 7, 2008, the ALJ issued an unfavorable decision finding that Plaintiff had the ability to perform light work and that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, thereby concluding that Plaintiff was "not disabled" under the Act. (R. at 62-69).  On March 13, 2009, the Appeals Council denied Plaintiff's request for review thereby making the ALJ's decision the final decision of the Commissioner.   (R. at 1-4).   Having exhausted all administrative remedies, Plaintiff filed this action on May 6, 2009. (Docket No. 1).  Plaintiff filed a motion for summary judgment on August 19, 2009 (Docket No. 8), and the Commissioner filed a motion for summary judgment on September 9, 2009 (Docket No. 10).

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[1] and 1383(c)(3)[2]. Section 405(g) permits a district court to review

---

[1]
    Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[2]
    Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

transcripts and records upon which a determination of the Commissioner is based. Because the standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding DIB), and judicial review thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-1383f, regarding Supplemental Security Income, or "SSI"), regulations and decisions rendered under the Title II disability standard, 42 U.S.C. § 423, are pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a). *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3(1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n. 1 (3d Cir. 2002).

When reviewing a decision denying DIB, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns,* 312 F.3d at 118. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

To be eligible for Social Security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).

The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §404.1520.  The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiffs's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## III.   FACTUAL BACKGROUND

Plaintiff was born on April 11, 1951 (R. at 117).  Plaintiff was fifty-four (54) years old as of March 31, 2006, the date Plaintiff was last insured for DIB under Title II. (R. at 68).  Plaintiff completed twelfth grade and has training as an associate in electrical technology. (R. at 132). Plaintiff was employed as a welder and welder group leader for 31 years, until October of 2000. (R. at 129).  Plaintiff's work as a welder ended when the plant closed in 2000. (R. at 49).  He also had an unsuccessful work attempt as a laborer in 2005. (R. at 141).

Plaintiff was seen by Dr. Joel Nystrom on February 16, 1999 with complaints of a "funny sensation" in his upper and lower distal extremities. (R. at 160).  Plaintiff was diagnosed with

polyneuritis[3] as well as carpal tunnel syndrome and complained that his symptoms had worsened over time. (*Id.*). Plaintiff denied having depression although he did have symptoms of poor concentration, fatigue and weakness. (*Id.*). Dr. Nystrom did not find any neurological problems, however, Plaintiff's reflexes were weak. (*Id.*). Plaintiff was seen by Dr. Nystrom on November 14, 2000 for a check up. (R. at 159). Plaintiff stated that his insurance was going to run out in two weeks and he wanted to get some tests done. (*Id.*). He complained of being short of breath on exertion and that he had a mild to moderate cough, but also indicated that he smokes. (*Id.*). Dr. Nystrom noted that Plaintiff had impaired hearing and could not discern much of what was said to him. (*Id.*). Dr. Nystrom diagnosed Plaintiff as having a right inguinal hernia and dyspnea on exertion with a long history of smoking, probably indicating COPD.[4] (*Id.*). Report of Plaintiff's pulmonary function test revealed his expiratory flow rates were within normal limits, as well as his lung volume and diffusing capacity. (R. at 178). On November 29, 2000, Dr. Nystrom reported that Plaintiff had his hernia repaired. (R. at 158). Chest x-rays showed that Plaintiff had a normal sized heart and pulmonary function tests showed mild obstructive changes with some reversibility after bronchodilator. (*Id.*).

Plaintiff was seen by Nurse Practitioner Colleen Goodwin on February 12, 2001. (R. at 157). Plaintiff's chief complaint was decreased attention and difficulty studying for a Vo-Tech electrical class that he had been taking. (*Id.*). Plaintiff indicated that he was down to one pack of cigarettes a day from two per day in November. (*Id.*). Nurse Practitioner Goodwin stated that

---

[3]

    An inflammation of nerves related to infiltration by amyloid. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

[4]

    COPD or chronic obstructive pulmonary disease is a general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

Plaintiff's blood work was within normal limits except for cholesterol and liver enzymes. (*Id.*). Plaintiff's balance, coordination and gait were all found to be within normal limits. (*Id.*). Nurse Practitioner Goodwin recommended that Plaintiff approach a teacher to consider alternative tutoring strategies and perhaps help though a literacy center. (*Id.*).

The record indicates that Plaintiff was not seen by any medical professional between February 2001 and August 2006 due to having no insurance. (R. at 148, 157, 200, 229). On August 10, 2006, Plaintiff was examined by Dr. John Schibli, an osteopath, with complaints of diabetes, neck pain and shoulder pain. (R. at 229). Plaintiff stated that he had borderline diabetes but did not regularly use a glucometer nor follow up with his primary care physician concerning his diabetes for over three years. (*Id.*). Plaintiff also complained of neck pain that would be so severe that it would cause him to fall asleep. (*Id.*). He stated that he had pain and numbness in his right arm and along his right side although he could walk about 100 yards before he needed to rest. (*Id.*). Plaintiff was not on any medications for his pain at the time. (*Id.*). In addition, Plaintiff stated he had hearing loss and used to have hearing aids in the past but he lost them. (R. at 230). Dr. Schibli indicated that Plaintiff had moderate hearing loss at low frequency and moderate to severe hearing loss at high frequency. (R. at 232). Dr. Schibli diagnosed Plaintiff as having moderately severe hearing loss, history of hyperlipidemia, history of impaired glucose tolerance, mild degenerative joint disease of the right shoulder and a nicotine addiction. (R. at 233).

On December 11, 2006, Plaintiff was seen by Dr. Nystrom for complaints of generalized weakness. (R. at 157). On January 5, 2007, Plaintiff had complaints of hurting all over and had symptoms of depression. (R. at 156). Dr. Nystrom prescribed Cymbalta for Plaintiff's depression. (*Id.*). Additionally, Dr. Nystrom reported that Plaintiff had a stroke with a narrowed

vertebral artery and an older cerebellar stroke that may explain some of Plaintiff's ataxia and coordination problems. (*Id.*).   Dr. Nystrom also indicated that Plaintiff had his gall bladder removed and that his incision looked fairly good. (*Id.*).   On March 14, 2007, Dr. Nystrom saw Plaintiff with complaints of neck pain going down his left arm with numbness into his hand. (*Id.*).   Plaintiff's cervical muscles were not tight, although, Plaintiff was known to have foraminal narrowing in the neck. (*Id.*).   Dr. Nystrom diagnosed Plaintiff with cervical disc disease and depression. (*Id.*).   Additionally, Dr. Nystrom noted that Plaintiff was tolerating Effexor for depression and that his dosage was being increased. (*Id.*).

On May 30, 2007, Plaintiff was seen by Dr. Nystrom for a follow up appointment.  (R. at 155).  Plaintiff stated that he was feeling the same and was having trouble sleeping through the night. (*Id.*).  Plaintiff complained of tingling down his shoulder, pain in his neck, and a tingling sensation up the back of his head. (*Id.*).   Dr. Nystrom stated that Plaintiff has a history of cerebellar infarction (stroke) and severe arthritis of his cervical spine as well as some paresthesias[5] in his arms. (*Id.*).  It was noted that due to Plaintiff's sleep related problems he was to be tested for sleep apnea. (*Id.*).  On July 11, 2007, Plaintiff still had complaints of fatigue and poor sleep. (*Id.*).  Plaintiff's girlfriend also indicated that he stopped breathing while sleeping and Dr. Nystrom suspected sleep apnea. (*Id.*).  On September 28, 2007, Plaintiff continued to have complaints of pain down his right arm and pain in his left posterior neck.  (R. at 154). Dr. Nystrom also indicated that Plaintiff had been having more falls, that his walking was not stable and that he had recently fallen off a tractor and bumped his head. (*Id.*).   Dr. Nystrom reported on December 3, 2007 that Plaintiff had fallen out of a tree and had progressively more pain with his right shoulder.  (R. at 153).  Plaintiff was seen on April 14, 2008, for abdominal pain and

---

[5]

An abnormal sensation, such as of burning, pricking, tickling, or tingling. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

burning in his chest.  (R. at 152).  Dr. Nystrom noted that Plaintiff had restricted range of motion of the right shoulder from arthritis. (*Id*.).

On August 10, 2006, Dr. Schibli, as a part of the Pennsylvania Bureau of Disability Determination, filled out a medical source statement of Plaintiff's work related abilities.  (R. at 234-235).  Dr. Schibli found Plaintiff to be able to occasionally lift and carry ten pounds and frequently lift and carry two to three pounds.  (R. at 234).  He considered Plaintiff to be able to stand and walk up to five hours and to have no limitations in sitting, pushing or pulling. (*Id*.). Dr. Schibli also found Plaintiff to be able to occasionally perform postural maneuvers.  (R. at 235).  Dr. Schibli indicated that Plaintiff did have hearing limitations and should be restricted from working near heights. (*Id*.).

On September 28, 2006, Plaintiff had a physical residual functional capacity assessment form filled out by state examiner, Denise Gault.  (R. at 202-208).  Because Plaintiff was only seeking Title II DIB, the state examiner assessed Plaintiff's RFC as of the date he was last insured, March 31, 2006.  The state examiner assessed Plaintiff as being able to occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours, sit for about six hours and have no limitations in pushing or pulling.  (R. at 203).  The examiner found that Plaintiff did have limitations hearing at high frequency.  (R. at 205).  It was stated that the medical evidence established impairments of hearing loss and mild degenerative joint disease of the right shoulder. (R. at 207).  Furthermore, the examiner noted that Plaintiff did not receive medical treatment for over three years prior to the date he was last insured. (*Id*.).  Additionally, the examiner stated that the file indicates Plaintiff did not seek medical care due to limited income and lack of medical insurance. (*Id*.).  The examiner found that there was inadequate evidence available prior to the date Plaintiff was last insured to address the credibility of Plaintiff's alleged limitations.  (R. at

208).  It was the examiner's opinion that the report of Dr. John Schibli contained inconsistencies with the file and was viewed as an overestimate of the severity of Plaintiff's RFC. (*Id.*).

Plaintiff also had a psychiatric assessment performed by state examiner, Roger Glover, on September 29, 2006.  (R. at 209-221).  The examiner found that Plaintiff had a history of alcohol abuse, but had no mental limitations.  (R. at 217, 221).[6]

On August 21, 2008, Dr. Nystrom filled out a job capabilities and restrictions form for the Plaintiff. (R. at 223-228).  Dr. Nystrom found Plaintiff to be capable of less than sedentary work, which included the limitations of not lifting more than ten pounds with any frequency, not sitting longer than one hour, and being incapable of obtaining or maintaining sedentary employment. (R. at 223). Furthermore, Dr. Nystrom indicated that Plaintiff would have serious limitations in his ability to follow work rules, relate to co-workers, deal with the public, deal with normal work stress and maintain his concentration.  (R. at 224).  In addition, Dr. Nystrom found that Plaintiff would have serious limitations in his ability to remember and carry out detailed and complex job instructions.  (R. at 225).  Plaintiff would also have a poor ability in relating predictably in social situations. (*Id.*).  However, Plaintiff was found to be able to "manage benefits in his .. own best interests." (*Id.*). Dr. Nystrom found Plaintiff to have the ability to occasionally lift and carry ten pounds, frequently lift two to three pounds, and  to have the capacity to stand and walk one hour or less in an eight hour work day.  (R. at 226).  In addition, Dr. Nystrom indicated that Plaintiff could only sit for four hours a day, for 30 minutes at a time.  (R. at 227).  Plaintiff also had limitation in his ability to push and pull with both his upper and lower extremities. (*Id.*).  Plaintiff was  considered to be able to occasionally bend at

---

[6]

At the hearing, Plaintiff's attorney stated that mental health limitations were offered to show that he has a physical problems that cause emotional upset and emotional overlay but not for disability on their own. (R. at 24).

the waist, although he could never kneel, stoop, crouch, balance or climb. (*Id*.).   Lastly, Dr
Nystrom found that Plaintiff had limitations in his ability to reach, manipulate his fingers, feel,
see, hear, speak, and should be limited in his exposure to heights, moving machinery, vibration
and noise.  (R. at 228).

      Plaintiff appeared and testified at the administrative hearing on September 10, 2008. (R.
at 10-56).   At the hearing, Plaintiff testified that his hearing loss requires him to have people
repeat themselves frequently. (R. at 14-15).   Plaintiff stated that he had a hearing aid a few years
ago, but no longer has it and has not replaced it due to cost. (*Id*.).   Plaintiff did indicate that he
had problems with drugs and alcohol in the past, but he stated he has not had a problem since
January 2008 and his use would not be a significant problem preventing him from working. (R.
at 21-22).   Plaintiff appeared with a cane at the hearing and stated that he started using it for
balance three or four months prior to the hearing. (R. at 23).   Plaintiff stated that he has never
sought treatment for any mental or emotional health problem. (R. at 23-24).

      Plaintiff testified that his physical condition at the date of the hearing was materially
worse than in 2000. (R. at 25).   He stated that he cannot stand or sit in one spot longer than 15
minutes because his left leg goes numb. (R. at 26).   Plaintiff was able to recall that in early 2006
his range of walking was about one mile. (R. at 27).   Plaintiff indicated that he was able to bend
down to pick up a light object, although it would cause him pain in his lower back and legs. (R.
at 28).   Additionally, Plaintiff stated that in early 2006, he could lift 25 to 30 pounds off of a
table. (R. at 29).   However, lifting 25 to 30 pounds prior to March of 2006 would have caused
pain in his neck and shoulder. (R. at 45).   Plaintiff stated that prior to March of 2006, he would
have had difficultly carrying around 10 pounds for a period of time. (R. at 48).   Moreover,

Plaintiff explained that he had pain in his lower back, neck, right shoulder and that he had undergone physical therapy for his shoulder. (R. at 29-30).

Plaintiff also testified that he has shortness of breath. (R. at 31). He stated that he smokes approximately three-quarters of a pack of cigarettes a day. (R. at 32). Furthermore, Plaintiff testified that he was capable of caring for his personal needs and that he performs household chores. (*Id.*). Plaintiff explained that in early 2006, on average he had to lie down at least once each day because of pain. (R. at 35-37). Additionally, Plaintiff testified that he had problems sleeping once or twice per week in 2006, however, his sleep problems had become worse since that time. (R. at 40-41).

Plaintiff testified that he worked primarily as a welder and welder group leader prior to October 1, 2000. (R. at 17-20). The VE, George Starosta[7], testified that Plaintiff's prior work as a welder was of a medium exertional level with a skill level SVP[8] of five and his work as a welder group leader was of a heavy exertional level with a skill level SVP of seven. (R. at 51).

---

[7]

Plaintiff stipulated to Mr. Starosta's professional qualifications at the September 10, 2008, hearing. (R. at 50). Starosta's C.V. states that he attained a Bachelor of Science in biology and Certificate in Secondary Education from King's College in 1975, that he completed course work for a Masters of Science in zoology/physiology at Clemson University and was awarded a Masters of Health Administration in hospital management from Georgia State University in 1979. (R. at 87-88). He is currently employed at Star Placement as a job specialist and researcher consultant and is president of Star Leadership Development, Inc. (R. at 87).

[8]

"SVP" refers to "specific vocational preparation" as defined in the Dictionary of Occupational Titles ("DOT") published by the United States Department of Labor. *See Martin v. Barnhart*, 240 Fed.Appx. 941, 943 (3d Cir. 2007). The DOT defines SVP "as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles, Appendix C: Components of the Definition Trailer, Section II*, *available at*: http://www.occupationalinfo.org/appendxc_1.html#II (last visited 12/21/09). The level of an individual's SVP is graded on a scale of 1-9. *Id.*

The VE stated that a hypothetical person with Plaintiff's limitations would not be able to perform a welder job at the light level if they were capable of light work, but limited to not having the ability to perform overhead reaching or lifting with the right dominant arm, not having the ability to work in loud noise environments or be exposed to pulmonary irritants. (R. at 52).  The VE stated that such a hypothetical person would be able to perform the positions of usher, ticket taker and an assembler type job. (R. at 53-54).

The ALJ determined that Plaintiff's medically determinable impairments did not meet the requirements for DIB and that Plaintiff retained the ability to perform jobs that exist in significant numbers in the national economy.  (R. at 68).  The ALJ's findings of fact and conclusions of law included: (1) that Plaintiff has not engaged in substantial gainful activity since October 1, 2000; (2) that Plaintiff has the severe impairments of degenerative joint disease of the right shoulder, degenerative disc disease of the cervical spine, low back pain, moderate to severe high-frequency hearing loss, and chronic obstructive pulmonary disease; (3) that Plaintiff's impairments or combination of impairments do not meet or medically equal one of the listed impairments; (4) that Plaintiff has the residual functional capacity ("RFC") to perform light work, however, he is limited to not perform any overhead reaching or lifting with his right arm and not to be exposed to loud noise or pulmonary irritants and that Plaintiff is unable to perform his past relevant work; and (5) that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. (R. at 64-68).  Accordingly, the ALJ found that Plaintiff was not disabled, as defined in the Social Security Act.  (R. at 69).

## IV.   DISCUSSION

Plaintiff raises three issues in challenging the ALJ's decision: (1) the ALJ improperly disregarded the medical opinion of Plaintiff's treating physician; (2) the ALJ improperly

discredited Plaintiff's testimony; and (3) the ALJ failed to consider Plaintiff's age as being borderline and mechanically applied the Medical-Vocational Guidelines ("grids").   The Commissioner argues that the ALJ's decision is supported by substantial evidence in the record and that the Plaintiff failed to meet his burden in proving that he was disabled before his insured status expired.   The Court will address each argument, in turn.

      A.    *Treating Physican's Medical Opinion*

      As to the first issue, Plaintiff argues that the ALJ failed to properly consider the medical opinion of Dr. Nystrom. (Docket No. 9 at 6-10).  Plaintiff states that the ALJ should have given the August 8, 2008 opinion of Dr. Nystrom greater weight than he did since the opinion was consistent with the medical evidence as a whole. "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.' *Plummer v. Apfel*, 186 F.3d at 422, 429(3d Cir. 1999) (*quoting Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987))."  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.2000) (additional citations omitted). The ALJ must weigh conflicting medical evidence and can choose whom to credit, but "cannot reject evidence for no reason or for the wrong reason." *Id.* at 317 (*quoting Plummer*, 186 F.3d at 429 (additional citations omitted)).  A treating physician's medical opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). The ALJ must consider all medical findings that support a treating physician's assessment that a claimant is disabled, and can only reject a treating physician's opinion on the

basis of contradictory medical evidence, not on the ALJ's own credibility judgments, speculation

or lay opinion. *Morales*, 225 F.3d at 317-18 (citations omitted).

> In the ALJ's decision, Dr. Nystrom's opinion was addressed as follows:

> I recognize that Dr. Nystrom, his treating physician, completed a medical source statement in August 2008 basically indicating that the claimant cannot perform even sedentary work and that he also has severe mental impairments [sic] limitations (Exhibit 6F). However, I do not afford much weight to Dr. Nystrom's assessment, as it is clearly unsupported by objective evidence especially for the period when the claimant was last insured. It would appear that Dr. Nystrom's assessment is a mere accommodation to the claimant. Furthermore, Dr. Nystrom's opinions with respect to the claimant's mental health status are clearly inconsistent with claimant's testimony and stipulation that he does not have any severe mental health condition.

(R. at 68). The ALJ highlighted that Dr. Nystrom did not examine Plaintiff between February of

2001 and December of 2006, which was after March 31, 2006, the date Plaintiff's insurance

status expired.[9] (R. at 66). The ALJ also pointed to the treatment notes of Dr. Nystrom and Dr.

Schibli that were closest in temporal proximity to Plaintiff's last insured date as follows:

> The additional reports from Dr. Nystrom indicate that despite the claimant's complaints thereafter, he was trying to obtain employment, and more recent reports indicate that the claimant was using a cutting torch daily, climbing a tree, and performing other activities (Exhibit 1F). When seen by Dr. Schibli about five months after he was last insured, the claimant was not on any prescribed or over-the-counter medications for his pain complaints and it noted that he had no motor weakness or neurological problems, almost full lumbar flexion, full range of motion in the cervical region, and only some restricted range of motion of the right shoulder.

---

[9]

"The last insured date is a statutory cut-off which precludes consideration of any new impairments which develop thereafter." *Livermore v. Barnhart*, 84 Fed.Appx. 264, 267 (3d Cir. 2004)(non-precedential)(quoting *Esposito v. Apfel*, CA 99-771, 2000 WL 218119 (E.D.Pa. 2000)); *see also* 20 C.F.R. §§ 404.101 - 404.132.

(R. at 66-67).[10]   In reviewing the record as a whole, the ALJ did sufficiently point to medical evidence that contradicts Dr. Nystrom's medical opinions concerning his functional capacity prior to the last date Plaintiff was insured.  As a result, it was not error for the ALJ to have given Dr. Nystrom's opinions little weight and the ALJ's decision is supported by substantial evidence in the record.

      B.     *Plaintiff's Credibility*

As to the second issue, Plaintiff contends that the ALJ did not properly set forth reasons for rejecting the Plaintiff's testimony. (Docket No. 9 at 10-12).  Plaintiff argues that the ALJ improperly considered Plaintiff's activities of daily living by failing to consider that Plaintiff testified that he was incapable of performing said activities on a sustained basis.

When the ALJ considers the subjective symptoms of the claimant, the ALJ is to evaluate the consistency of those symptoms with the objective medical evidence and other evidence. *See* 20 C.F.R. §404.1529.  Great deference is owed to the credibility determinations of the ALJ since the ALJ has the first hand opportunity to assess the claimant.  *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003).   In making his or her determination, the ALJ must consider and weigh all of the evidence, both medical and non-medical, that support a claimant's subjective testimony about symptoms and the ability to work and perform activities, and must specifically explain his or her reasons for rejecting such supporting evidence. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 119-20 (3d Cir. 2000). Moreover, an ALJ may not substitute his or her evaluation of

---

[10]

     "Retrospective diagnosis of an impairment, even if uncorroborated by contemporaneous medical records, but corroborated by lay evidence relating back to the claimed period of disability, can support a finding of past impairment. Thus, even non-contemporaneous records of [plaintiff's impairments] are relevant to the determination of whether their onset occurred by the date [plaintiff] alleges. " *Newell v. Commissioner of Social Security*, 347 F.3d 541, 547 (3d Cir. 2003)(citations omitted).

medical records and documents for that of a treating physician; "an ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting the laboratory reports." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

The ALJ held that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." (R. at 66). The ALJ went on to discuss the findings of Dr. Nystrom and Dr. Schibli, as detailed above, that did not indicate total debilitating musculoskeltal conditions. (R. at 66-67). The ALJ discussed Plaintiff's pulmonary limitations and that Dr. Schibli's notes indicated that Plaintiff denied having shortness of breath and only had an occasional cough. (R. at 67). The ALJ also pointed out that despite Plaintiff's hearing loss, he was able to communicate and had not sought to replace his hearing aids. (*Id.*). In viewing the record as a whole, substantial evidence supports the ALJ's conclusion that Plaintiff's subjective pain symptoms were less than totally debilitating. *See Burns*, 312 F.3d at 129-130. The ALJ did not err in his determination that Plaintiff's statements were less than fully credible, as the ALJ weighed and discussed the evidence before him consistent with the Social Security Act.

C.    *Borderline Age Situation*

As to the third issue, Plaintiff argues that the ALJ failed to properly apply the grids in a non-mechanical fashion as required by the regulations. (Docket No. 9 at 5-6). The regulations regarding age as a vocational factor state:

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you

are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors in your case.

20 C.F.R. § 404.1563(b).  Plaintiff was 54 years old as of March 31, 2006, and was eleven days from turning 55 years old.  Therefore, based on his age at that time, Plaintiff was classified as a "Person closely approaching advanced age" but was eleven days from being classified as a "Person of advanced age."[11]  The United States Court of Appeals for the Third Circuit has held that where the ALJ had not applied §404.1563(b), and if the application of that regulation could change the ALJ's determination, the matter must be remanded for further consideration. *Kane v. Heckler*, 776 F.2d 1130, 1134 (3d Cir. 1985).

No brightline rules exist for when a borderline age situation exists, however, it is not disputed by the Commissioner that being 11 days from a higher age category does raise the possibility that §404.1563(b) will apply. (Docket No. 11 at 3).  Indeed, in *Kane*, the claimant was forty-eight days from his 55th birthday and it was considered to be a borderline case.[12] *Kane*, 776

---

[11]

(d) Person closely approaching advanced age.  If you are closely approaching advanced age (age 50-54), we will consider that your age along with severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work.

(e) Person of advanced age.  We consider that at advanced age (age 55 or older), age significantly affects a person's ability to adjust to other work.  We have special rules for persons of advanced age and for persons in this category who are closely approaching retirement age (age 60 or older).

20 C.F.R. §404.1563

[12]

Borderline age situations have been held to exist for claimants that were between nine and eleven months from the next higher age category. *Martin v. Astrue*, Civ. No. 07-1316, 2008 WL 3071484, *4 (W.D.Pa. Aug. 1, 2008)(citing *Rosado v. Bowen*, No. 85-5581, 1986 WL 15004 (E.D.Pa. Dec. 30, 1986); *Perkins v. Heckler*, No. 85-3907, 1986 WL 11831 (E.D.Pa. Oct. 20, 1986)). This Court previously held in *Martin* that 191 days was not a borderline age situation. *Martin*, 2008

F.2d at 1133.   Next, when viewing the Medical-Vocational Guidelines for claimants limited to light work, Rule 202.06, if Plaintiff's previous work experience was found to be non-transferable the Rule would direct a decision of "disabled" under the Act. 20 C.F.R. Pt. 404 Sub.Pt. P, Appx 2 sec. 202.06.[13]   In the ALJ's decision, he specifically did not make a finding as to transferability stating "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled' whether or not the claimant has transferable job skills." (R. at 68).   Therefore, the record does not eliminate the possibility that if Plaintiff were considered as a person of advanced age, the ALJ's decision would have resulted in a finding of disability.

The Commissioner states that the Hearings, Appeals, and Litigation Law Manual ("HALLEX") II-5-3-2 was applied in this case.   The HALLEX states:

> To identify borderline age situations when making disability determination, adjudicators will apply a two part test: (1) Determine whether the claimant's age is within a few days or a few months of a higher age category. (2) If so, determine whether using the higher age category would result in a decision of "disabled" instead of "not disabled." . . . To decide which age category to use, take a "sliding scale" approach.   Under this approach, the claimant must show progressively more additional vocational adversity(ies) - to support use of the higher age - as the time period between the claimant's actual age and his or her attainment of the next higher age category lengthens. . . .   Absent a showing of additional adversity(ies) justifying use of the higher age category, the adjudicator will use the claimant's chronological age - even when the time period is only a few days. The adjudicator need not explain his or her use of the claimant's chronological age.

_____

WL 3071484, at *9.  However, *Martin* is factually distinguishable as the period involved here is only 11 days.

[13]

Rule 202.06 states that if the maximum sustained work capability is limited to light work as a result of severe medical determinable impairment(s), the claimant is of advanced age, the claimant's education is high school graduate or more - does not provide for direct entry into skilled work, previous work experience is "skilled or semi-skilled - skills not transferable," then the decision is directed to be disabled.  20 C.F.R. Pt. 404 Sub.Pt. P, Appx 2, Sec. 202.06.

HALLEX II-5-3-2.  The Commissioner argues that under the HALLEX, the ALJ did not find Plaintiff's limitations significant enough to be considered "additional adversities" that would justify using a higher age category and that the ALJ was not required to explain his reasons for doing so.  (Docket No. 11 at 12).  Additionally, the Commissioner argues that the ALJ gave the Plaintiff the "benefit of the doubt" in reducing Plaintiff's occupational base to light work with limitations on overhead lifting with his right arm. (*Id*. at 13-15).  Based upon this "benefit of the doubt," the Commissioner argues that the ALJ could not have reasonably found that Plaintiff justified being placed in a higher age category. (*Id*.).

First, it must be noted that the HALLEX is an internal guidance tool and has no legal force; thus, it is not judicially enforceable or binding.  *See Edelman v. Commissioner for Social Security*, 83 F.3d 68, 71 n.2 (3d Cir. 1996)(Program Operation Manual System (POMS) does not have the force of law), *Bordes v. Commissioner of Social Security*, 235 Fed. Appx. 853, 859 (3d Cir. 2007)(non-precedential).  Despite the HALLEX's advice that "[t]he adjudicator need not explain his or her use of the claimant's chronological age," the United States Court of Appeals for the Third Circuit has made clear that where the ALJ fails to address the regulation when relevant, the case must be remanded. *Kane*, 776 F.2d at 1133, *see also Lucas v. Barnhart*, 184 Fed. Appx. 204, 208 (3d Cir. 2006)(non-precedential)(ALJ decision was not supported by substantial evidence where record failed to contain findings relevant to § 404.1563(b) where plaintiff was 106 days from higher age category.).  As further examples, several decisions in this District Court have held that the failure to discuss and analyze a borderline situation under §404.1563(b) requires that the case be remanded for reconsideration. *Ludvico v. Astrue*, Civ. No. 08-332, 2008 WL 5134938 (W.D.Pa. Dec. 5, 2008)(Case remanded where ALJ failed to consider or address a borderline grid situation where plaintiff was five months from a higher age

category.);  *Istik v. Astrue*, Civ. No. 07-1468, 2009 WL 382503 (W.D.Pa. Feb. 13, 2009)(Mere

mention of plaintiff's age was not enough to show that ALJ considered or conducted a borderline

age analysis when plaintiff was seven months from a higher age category.); *Davis v. Astrue*, Civ.

No. 08-928, 2009 WL 3241853 (W.D.Pa. Oct 5, 2009)(The failure by the ALJ to consider and

address a borderline age situation where plaintiff was four months from a higher age category

resulted in remand.).   In regards to the Commissioner's argument that Plaintiff was given the

"benefit of the doubt," there is no record in the ALJ's opinion indicating that the ALJ decided to

limit Plaintiff's RFC beyond what the medical evidence indicated.   Moreover, there is no

discussion or rationale by the ALJ as to why Plaintiff's chronological age was used instead of

the higher age category.   As a result, since there is no discussion as to Plaintiff's borderline age,

substantial evidence does not exist in the record to support that the ALJ did not mechanically

apply the Medical-Vocational Guidelines.

## V.   CONCLUSION

Because the ALJ failed to provide an adequate discussion to ensure that the Medical-

Vocational Guidelines were not applied mechanically, this case must be remanded for further

consideration.   To that end, Plaintiff's Motion for Summary Judgment [8] will be granted, in part

and denied in part and Defendant's Motion for Summary Judgment [10] will be denied.

Plaintiff's motion is denied to the extent that it seeks an award of benefits and it is granted to the

extent that it seeks a vacation of the administrative decision currently under review and a remand

for further proceedings. Accordingly, the decision of the ALJ will be vacated and remanded for

further consideration consistent with this Opinion.

An appropriate Order follows.

BY THE COURT:
*s/ Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Dated: December 21, 2009.

cc/ecf: All counsel of record.